**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

|  |  |
|---|---|
| LAYER1 TECHNOLOGIES INC.,<br><br>         Plaintiff,<br><br>    vs.<br><br>BLOCKBASE GROUP DWC-LLC, BBG<br>HOLDINGS GMBH, BLOCKBASE<br>CONSULTING GMBH, VLADO STANIC,<br>AND ALEXANDER DIETRICH,<br><br>         Defendants. | Civil Action No.: 4:22-cv-00007<br><br>**COMPLAINT AND DEMAND FOR**<br>**JURY TRIAL** |

## COMPLAINT

Plaintiff Layer1 Technologies Inc. ("Layer1") sues Defendants Blockbase Group DWC-LLC ("Blockbase Group"), BBG Holdings GmbH ("BBG Holdings"), Blockbase Consulting GmbH ("Blockbase Consulting") (collectively referred to as "Blockbase"), Vlado Stanic ("Stanic") in his individual capacity, and Alexander Dietrich ("Dietrich") in his individual capacity (each individually, "Defendant," and collectively "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.      As described in more detail below, Jakov Dolic ("Dolic") and Defendant Vlado Stanic, the Co-Founder and CEO of Blockbase, entered into agreements that, at their core, were quite simple:  Dolic and Stanic (and several others) would found a cryptocurrency mining company called Layer1.  Dolic would contribute the necessary cash (nearly $30 million) and containerized, high-density mining technology, including an innovative cooling system.  Stanic's company, Blockbase, would contribute mining management technology—including software and intellectual property—for Layer1's exclusive use and benefit.  Both Dolic and Blockbase (and the other

1

founders) would receive shares of Layer1; Blockbase, in particular, would receive one million shares.

2.      But Blockbase never intended to honor its commitments to Layer1.  Contrary to what Blockbase promised, Blockbase never actually delivered much of its technology to Layer1. And worse still, within weeks of signing over all of its technology to Layer1, Blockbase provided that technology (which Blockbase no longer owned) to one of Layer1's competitors, HIVE Blockchain Technologies Ltd. ("HIVE"), in exchange for substantial payments.  In short, Blockbase engaged in unlawful double-dealing:  Blockbase promised Layer1 exclusive access to and ownership of its technology and intellectual property so that Blockbase would receive a million shares of a company (Layer1) into which Dolic would pump near $30 million of his own, but then Blockbase turned around and delivered the same technology to HIVE (a fierce competitor) for a second payout.  The events leading to this duplicity are summarized below.

3.      To begin, Blockbase is in the cryptocurrency mining business.  As explained further below, "mining" Bitcoin means running computers to solve certain cryptographic problems necessary to complete transactions in which Bitcoin is exchanged.  As an incentive for successfully completing this cryptographic computer work, the "mining" company receives a reward in the form of Bitcoin.  Blockbase provides mining technology services, including software-based mining management and co-location services, *i.e.*, leasing physical space and power to Bitcoin miners who receive from Blockbase both a location and sufficient energy for their mining operations.

4.      Blockbase's Co-Founder and CEO, Vlado Stanic, met Dolic at a Bitcoin mining conference in 2017, and immediately recognized that Dolic is a successful mining entrepreneur.

Because Dolic had funds to launch a new mining operation — funds that Blockbase lacked – Stanic began pursuing Dolic.

5.      But Dolic's economic resources were not the only point of attraction for Stanic to Dolic.  Bitcoin mining is a notoriously energy-consuming process.  Although West Texas's wind turbines reliably produce the world's least expensive energy, just several years ago, most Bitcoin miners would not think of operating here because the industrial mining computers would run too hot in the Texas summers.  But Dolic and his partner Ivan Kirillov had pioneered containerized, high-density mining technology, including a liquid cooling system, that can take advantage of affordable West Texas energy while avoiding the overheating problems that would plague other Bitcoin miners.  Stanic wanted to leverage Dolic's technological innovations and his money alike.

6.      Accordingly, Stanic proposed that Dolic use Dolic's personal funds to acquire a property in Pyote, Texas with an electrical substation to mine using Dolic's technology.  Stanic hoped to reap the benefits of Dolic's financial and technological investments without investing any money himself.  Instead, Blockbase would contribute its mining management technology and intellectual property, especially software and know-how.

7.      Eventually, Dolic decided to launch Layer1 and agreed to Stanic's proposal.  Together, Dolic, Kirillov, Blockbase Group and others founded Layer1.

8.      Stanic, together with Blockbase's Co-Founder and CTO, Alex Dietrich, promised that Blockbase Group would transfer and assign all of its mining technology and related intellectual property, including[1] Blockbase's Group's software, to Layer1.  In exchange, Layer1 would issue 1,000,000 "founder's" shares of its stock to Blockbase Group.  This agreement was memorialized in two written contracts:  (1) a Founder's Restricted Stock Purchase Agreement

---

[1] Throughout this Complaint, "including" means "including but not limited to."

("Founder's Agreement") and (2) an Assignment of Technology Agreement ("Assignment Agreement") (collectively, the "Agreements") (the Agreements attached as Exhibit 1).

9.     Stanic and Dietrich flew to Texas to seal the deal with Dolic and Kirillov, and Stanic signed the Agreements there.   Stanic, Dietrich, Dolic, and Kirillov then visited the electrical substation in Pyote, Texas that Layer1 ultimately purchased with Dolic's funds and which Layer1 uses to this day.

10.     Defendants, however, had no intention of honoring their promises.   Rather, they fraudulently induced Layer1 to enter into the Agreements so they could get Layer1 founder's stock.

11.     At the same time that Defendants were negotiating and entered the Agreements, they were negotiating a "strategic partnership" with one of Layer1's competitors, HIVE.   In hindsight, it appears that Defendants' true loyalty was *always* to HIVE, perhaps because Blockbase and HIVE were next-door neighbors on the same parcel of land in Sweden, and had been for nearly two years.   In any event, less than two months after Blockbase Group entered into the Agreements with Layer1 and received the founder's shares, HIVE announced that Blockbase Group had contracted to manage HIVE's mining operations.

12.     Defendants failed to deliver to Layer1 all of the contracted-for technology and assets, and instead used them to further HIVE's competing operations.   Nor did Defendants transfer any know-how or deliver any documentation to Layer1 explaining how Blockbase's software, including its source code, worked.   This left Layer1 dependent on Defendants to operate and otherwise adapt the software to Layer1's mining operations, and simultaneously positioned Defendants to deliver that same technology and know-how—and a competitive jump start—to HIVE.

13.     Defendants defrauded Layer1, breached the Agreements, misappropriated the trade secrets they assigned to Layer1, and have been unjustly enriched.  Layer1 accordingly seeks rescission of the Agreements; compensatory, statutory, and punitive damages; injunctive and other equitable relief; attorneys' fees; and costs and interest.

## PARTIES

14.     Plaintiff Layer1 is a Delaware corporation with a registered place of business at 221 Kearny Street, Second Floor, San Francisco, California 94108.  Layer1 maintains its cryptocurrency mining and co-location facility in Pyote, Texas.

15.     On information and belief, Blockbase Group DWC-LLC, was formed and organized under the laws of Dubai, registered under Registration Number 6422, and located at Dubai World Central DWC Business Center, 1st Floor, P.O. Box 390667, Dubai Logistics City, United Arab Emirates.

16.     On information and belief, Blockbase Group has a principal place of business located at Am Belvedere, 10 QBC,  2A Süd 7.OG/Top 10, 1100 Wien (Vienna), Austria, where it maintains corporate headquarters and runs its operations when not directly run at a client site.

17.     On information and belief, Blockbase Consulting GmbH is an Austrian entity that has a principal place of business located at Am Belvedere, 10 QBC, 2A Süd 7.OG/Top 10, 1100 Wien (Vienna), Austria, where it maintains corporate headquarters and runs its operations when not directly run at a client site.

18.     On information and belief, Blockbase uses the mining management technology assigned to Layer1 for Blockbase's own worldwide mining and co-location operations, and also uses that technology to service HIVE's worldwide operations.

5

19.     On information and belief, BBG Holdings GmbH is an Austrian entity that has its principal place of business located at Am Belvedere 10, QBC 2A, Süd 7.OG/Top 10, 1100 Wien (Vienna), Austria.

20.     On information and belief, Blockbase Group, Blockbase Consulting, and BBG Holdings are essentially one and the same as each other, and are alter egos of one another, and of Stanic and Dietrich.

21.     On information and belief, Stanic and Dietrich have set up a complex network of entities, including Blockbase Group, Blockbase Consulting, and BBG Holdings, to maintain their fraudulent and illegal acts, and to otherwise avoid taxes, debt, and other liabilities.

22.     On information and belief, the various Blockbase entities, including Blockbase Group, Blockbase Consulting, and BBG Holdings, are operated by Stanic and Dietrich.

23.     On information and belief, Blockbase Group is owned by Stanic, Dietrich, and an investor, Gerald Eder ("Eder").

24.     On information and belief Blockbase Group is operated and controlled by Stanic and Dietrich.

25.     Blockbase Group's website, blockbasemining.com, lists only Stanic, Dietrich, and Eder as Blockbase's "Team."  *See* https://blockbasemining.com/about/ (last visited February 28, 2022).

26.     On information and belief, at least Blockbase Group, by and through Stanic and Dietrich, "builds and manages data centers in … the USA for high-performance computing (HPC) application such as cryptocurrency mining."  https://blockbasemining.com/careers/ (attached as Exhibit 2, last visited February 28, 2022).

27.     On information and belief, as of the filing of this Complaint, Stanic, Dietrich, and Eder collectively held at least the majority of Blockbase Group's shares, directly or indirectly.

28.     On information and belief, as of the filing of this Complaint, Stanic, Dietrich, and Eder collectively held all of Blockbase Group's shares, directly or indirectly.

29.     On information and belief, Blockbase Group conducts at most *de minimis* business activity in Dubai, and has no physical presence in Dubai.

30.     On information and belief, Blockbase Group incorporated in Dubai to capitalize on tax and accounting advantages.

31.     On information and belief, Blockbase Group uses a post office box in Dubai and does not advertise any mining centers in Dubai.

32.     In June 2021, Layer1 sent certified mail via international courier to Blockbase Group at its registered business address in Dubai.  In July 2021, after the international courier notified Layer1 that the mail could not be delivered to that address, Layer1 contacted Blockbase's U.S. counsel at Ashby & Geddes, P.C., who directed Layer1 to send the mail to Stanic at BBG Holdings and Blockbase Consulting's registered business address in Vienna, Austria.

33.     On information and belief, Stanic resides in Austria.

34.     On information and belief, Dietrich resides in Austria.

35.     On information and belief, Eder resides in Austria.

36.     As of the filing of this Complaint, Stanic and Dietrich were Blockbase Consulting's Managing Directors.

37.     Until September 18, 2020, all of Blockbase Consulting's shares were held by a combination of Blockbase Group, another Dubai entity named Blockbase Group DMCC, and Eder.

38.     As of the filing of this Complaint, BBG Holdings is the sole shareholder of Blockbase Consulting's shares.

39.     On information and belief, Blockbase Consulting, under the technical supervision of Dietrich, is at least partially responsible for developing and modifying the source code underlying the Blockbase mining management software—now owned by Layer1—for other Blockbase alter egos, including Blockbase Group, and BBG Holdings.

40.     BBG Holdings is the parent company to Blockbase Group and Blockbase Consulting.

41.     As of the filing of this Complaint, BBG Holdings' Managing Directors were Stanic, Dietrich, and Eder.

42.     As of the filing of this Complaint, all of BBG Holdings' current shareholders were companies that were in turn owned by Stanic, Dietrich, and Eder.

43.     As of the filing of this Complaint, Versus Investment GmbH, Finbase GmbH, and EDGE Enterprises GmbH collectively owned all of BBG Holdings' shares.

44.     As of the filing of this Complaint, Versus Investment GmbH was wholly owned by Stanic.

45.     As of the filing of this Complaint, Finbase GmbH was wholly owned by Dietrich.

46.     As of the filing of this Complaint, EDGE Enterprises GmbH was wholly owned by Eder.

47.     As another example of Defendants' use of alter-ego entities, and on information and belief, Defendants used another entity, Blockbase AB, to avoid debts by initiating bankruptcy proceedings for that entity.

48.     On information and belief, at the time this Complaint was filed, all of Blockbase AB's shares were owned by Stanic and Dietrich.

49.     As of the time this Complaint was filed, Stanic was Chair of Blockbase AB's Board of Directors, and Dietrich was a Board Member.

50.     On information and belief, apparently having formed Blockbase AB as a liability or tax shelter, Defendants initially named that entity "CC Shelter AB."

51.     On information and belief, as further explained below, Stanic and Dietrich used the "Blockbase" corporate entities, including Blockbase Group, Blockbase Consulting, BBG Holdings, to commit fraudulent and illegal acts, including committing actual fraud.  The fraud was committed primarily for the direct personal benefit of Stanic and Dietrich.  Neither Stanic nor Dietrich were acting in good faith on the entities' behalf.

## JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Layer1, Blockbase Group, Blockbase Consulting, BBG Holdings, Vlado Stanic and Alexander Dietrich are diverse for purposes of citizenship and Layer1 seeks relief in excess of $75,000, exclusive of interest and costs.  Layer1 is incorporated under the laws of the State of Delaware and has its principal place of business in the State of California, so it is a citizen of Delaware and California.  Blockbase Group is a foreign entity because it is incorporated in Dubai, registered under the laws of Dubai, and maintains a principal place of business in Austria (as set forth in ¶ 16).  Blockbase Consulting is a foreign entity because it is incorporated and maintains its principal place of business in Austria (as set forth in ¶¶ 17).  BBG Holdings is a foreign entity because it is incorporated and maintains its principal place of business in Austria (as set forth in ¶ 19).  Vlado Stanic and Alexander Dietrich are also foreign citizens (as set forth in ¶¶ 33-34).

53.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(b)(1) for misappropriation of trade secrets.

54.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so closely related to Plaintiff's federal claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 that they form part of the same case or controversy.

55.     This Court has personal jurisdiction over Blockbase Group, Blockbase Consulting, BBG Holdings, Stanic and Dietrich because each of the Defendants has purposely availed themselves of the privileges and benefits of the laws of the State of Texas.  The Defendants also purposely availed themselves of the privileges of conducting business in the State of Texas and in this District.

56.     Each of the claims, including the breach of contract and fraud claims, arise directly from the Defendants' activities in this District.  A substantial portion of the at-issue Agreements between the Parties was discussed, breached, anticipated to be performed, and were in part performed by Layer1 and Blockbase in Pyote, Texas (as set forth more fully throughout including in ¶¶ 58, 62 and 66).

57.     The discussions and negotiations were conducted by Stanic and Dietrich on behalf of Blockbase.  Stanic and Dietrich travelled to Houston, Texas to finalize and execute the Agreements, and to induce Layer1 into entering the Agreements by making false promises.

58.     Defendants and Layer1 envisioned that performance on the Agreements, at least in part, would be in Pyote, Texas, including because the technology and intellectual property that was the subject of the Agreements would be used in Pyote and otherwise transferred to Pyote.

59.     More generally, Defendants have availed themselves of doing business in the United States, and of United States courts, as explained throughout this Complaint, including, for example, directly below.

60.     For example, Blockbase Group, through at least Stanic, agreed that its Agreements with Layer1 would be expressly governed to California law.

61.     Additionally, Blockbase represents on its website's recruiting page that it "builds and manages data centers in … the USA for high-performance computing (HPC) application such as cryptocurrency mining." https://blockbasemining.com/careers/ (Exhibit 2, last visited February 28, 2022).

62.     Further, in 2020, Stanic traveled to the United States and attended meetings at Layer1's California office on Blockbase's behalf to attempt to raise money from United States investors for Layer1's Pyote mining operations.

63.     As another example, in 2021, Blockbase Group, among other shareholders, initiated a lawsuit against Layer1 in the United States to inspect Layer1's corporate books and records. That lawsuit is currently pending. *See* C.A. No. 2021-1041 (Delaware Chancery Court).

64.     As a further example, Stanic advertises on his LinkedIn page that he "started Bitcoin mining before 2015 and grew the operation … to multiple Mega Watt facilities in Austria, Sweden, Iceland, Texas." https://www.linkedin.com/in/vladostanic/ (last visited February 28, 2022, emphasis added).

65.     Upon information and belief, each of the Defendants may be served pursuant to the provisions of the Hague Convention.

66.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3), and/or 28 U.S.C. § 1391(d).  As described above and throughout this Complaint, the acts and transactions

constituting the violations herein occurred in part in this District, the Defendants are subject to personal jurisdiction in Texas in this District, and Defendants' most significant contacts with the United States are in Texas.  As illustrative, non-limiting examples, Defendants visited the Pyote, Texas substation, induced Layer1 to purchase the substation, defrauded Layer1 in this District by falsely representing Blockbase would transfer and assign to Layer1 all of its cryptocurrency mining technology and related intellectual property for use at the Pyote mining facility, and failed to deliver all of the technology to the Pyote facility, injuring Layer1 in this District.

## FACTUAL ALLEGATIONS

I.  **The Highly Competitive Cryptocurrency Mining Business, and Layer1's Unique Ties to West Texas**

67.    Cryptocurrency mining involves generating and introducing new cryptocurrency into circulation.  Cryptocurrency transactions are tracked through a decentralized, publicly available ledger of all transactions across the cryptocurrency network, known as the "blockchain." Mining involves solving extremely complex mathematical problems that validate cryptocurrency transactions to the blockchain, thereby providing security for the cryptocurrency network.

68.    Solving these complex mathematical problems requires tremendous amounts of computer-processing power.  This, in turn, requires access to, among other things, an inexpensive source of electricity and a cool environment to offset the heat produced by the computer processors.  This is why commercial cryptocurrency mining operations are typically conducted in locations such as Iceland, where geothermal energy is available at a low price and the naturally cool climate is a boon for counteracting the heat produced by the necessary computer processors.

69.    Investopedia explains that "Bitcoin mining is painstaking, costly and"—for most investors—"only sporadically rewarding."

70.     Indeed, most large-scale attempts at Bitcoin mining end in significant losses.  The Bitcoin network is capped at 21 million bitcoins, over 18 million of which have already been mined to date.  The network is designed so that blockchain validation becomes more difficult when more people enter the mining market.  This way, the number of Bitcoins produced in a given time period does not increase.

71.     Layer1 is the first U.S.-based renewable-energy Bitcoin mining company and is integral to the Texas energy economy.

72.     Texas's electrical grids face increasingly large volatility swings from wind and solar power generation.  The largest U.S. renewable energy producers requested that Layer1 help solve the market and grid volatility, and Layer1 answered that call.  Its Pyote mining center acts as a large-scale energy transforming system.

73.     Layer1's center can utilize and pay for 100% of the Texas ERCOT grid's produced renewable energy.  This helps Texas by reducing average energy market price and supporting the development of renewable energy grids.  Layer1's mining center is qualified as a controllable load resource (CLR) for the Texas grid.  Layer1's pioneering modular units serve as energy-capacity buffers.  When Layer1 is not actively mining, it can provide energy back to the Texas power grid, actively stabilizing Texas's seasonally volatile energy market and grid.

74.     Yet, as a cryptocurrency mining company, and especially one that mines Bitcoin, Layer1 faces fierce, industrial-scale competition.

## II.   Blockbase's Business:  Providing Highly Optimized Software Monitoring and Co-Location Services to Cryptocurrency Mining Operations

75.     Due to the ever-increasing difficulty and expense of mining, mining companies must highly optimize their computer algorithms if they are to stand a chance against the competition.

76. Blockbase provides technology services to cryptocurrency mining operations, including software-based optimization of mining operations, and co-location.

77. Blockbase's mining optimization software performs such functions as, for example, monitoring crypto mining hardware operations, measuring and remotely adjusting performance, configuration, controlling potential overheating and alerting, adjusting overclocking (to run the system at higher clock speed than it was originally designed for), overseeing onsite maintenance, remote shutdown and activation of the mining hardware, and other checks and controls.

78. Blockbase also provides co-location services, which involve leasing space and power to other mining operations on-site at one of Blockbase's data centers.

## III.   Defendants' Pursuit of West Texas Mining Operations and the Agreements with Layer1

79. Because Blockbase and Stanic did not have funds to start their own mining operation in West Texas, they offered to sell their technology and all associated rights—including without limitation Blockbase's software, technology services know-how, intellectual property, and all improvements—to Layer1 in exchange for "founder's" shares of Layer1 stock.

80. In or around September 2017, Stanic met Dolic at a cryptocurrency mining conference in London — OMNIA Mining.

81. On information and belief, around that time, Blockbase Group, Stanic, and Dietrich had technology for managing cryptocurrency mining facilities, including software, but did not have funds to establish a new mining facility. However, Stanic recognized that Dolic was a successful Bitcoin-mining entrepreneur and believed that Dolic had funds to acquire a property and establish a new mining facility.

82. Following the OMNIA conference, Stanic contacted Dolic on an approximately monthly basis to pursue a cryptocurrency mining business venture with Dolic.

83.     Stanic became interested in acquiring an electrical substation and associated property in Pyote, Texas.

84.     On information and belief, by 2019, Blockbase was in dire financial straits, having defaulted on financial obligations, including electricity bills, and was facing asset seizures by European governmental authorities.

85.     On information and belief, Defendants did not have the funds to acquire the Pyote substation and associated land.  However, Defendants believed that Dolic had such funds, and knew that Dolic and Kirillov had unique modular and cooling technology that would be extremely useful in Pyote.

86.     In or around March 2019, Stanic proposed to Dolic that Dolic acquire the Pyote substation and land using Dolic's personal funds, and use Dolic's pioneering technology to start a new mining operation.  Stanic hoped to profit off this new venture without contributing money, but instead by selling Blockbase's mining management technology and intellectual property.

87.     Initially, Dolic communicated to Stanic that he was not interested.

88.     However, after deciding to launch Layer1, Dolic further considered Blockbase's participation in and potential contribution to the new venture.

89.     In or around June 2019, Blockbase Group, Stanic, and Dietrich proposed that Blockbase Group would sell its mining and technology services technology to the new company—which would become Layer1—in exchange for shares of stock in the new company.

90.     This was eventually agreed upon, and written contracts—the Agreements—were prepared.

91.     On June 20, 2019, Defendants Stanic and Dietrich, representing Blockbase, met with Dolic and other Layer1 representatives in Houston, Texas.  There, Stanic signed the Founder's

Agreement and Assignment Agreement on behalf of Blockbase Group. Layer1 signed in the United States as well.

92.     Layer1 was incorporated on June 21, 2019.

93.     On June 21, 2019, Stanic and Deitrich, on behalf of Blockbase Group, met with Layer1 representatives, including Dolic and Kirillov, at the Pyote substation to evaluate buying the Pyote substation and associated land for mining.

### A.  **Founder's Restricted Stock Purchase Agreement**

94.     Effective July 1, 2019, Layer1 and Blockbase Group entered into the Founder's Agreement.  *See* Ex. 1.

95.     The Founder's Agreement provides that Blockbase Group would purchase 1,000,000 shares of Layer1.  *Id*. § 1.  In return Blockbase Group would pay consideration by "deliver[ing]" two parts:  (1) a $50 check and (2) an "assignment to [Layer1] of certain technology and related rights owned by [Blockbase Group] by delivery to [Layer1] of an Assignment of Technology Agreement," attached as Exhibit 5 to the Founder's Agreement.  *Id*. § 2.1.

96.     Stanic signed the Founder's Agreement as "CEO" of Blockbase Group.  *Id*. p. 12.

### B.  **Assignment of Technology Agreement**

97.     Blockbase Group and Layer1 also entered into the Assignment Agreement, effective no later than July 1, 2019, as Exhibit 5 to the Founder's Agreement.  Ex. 1 at Ex. 5.

### C.  **Blockbase Granted the Entire Right, Title, and Interest in the Assigned Assets to Layer1**

98.     The Assignment Agreement recites that Blockbase Group "desires to assign and transfer to [Layer1] **all** of [Blockbase Group]'s **right, title and interest** in and to the Technology and other related rights in full or partial exchange for [Layer1's] issuance to [Blockbase Group] of 1,000,000 shares of [Layer1]'s Common Stock…."  *Id*. at Ex. 5 § A (emphasis added).

16

99.     The Assignment Agreement further states that "[t]he parties are entering into this Agreement pursuant to that certain Founder's Restricted Stock Purchase Agreement by and between [Layer1] and [Blockbase Group] dated of even date herewith…."  *Id*. at Ex. 5 § B.

100.    By the express terms of the Assignment Agreement, Blockbase Group:

> "forever **sells, assigns, transfers, releases and conveys** to [Layer1], and its successors and assigns, [Blockbase Group]'s **entire right, title and interest in** and to each and all of **the Assigned Assets**, including but not limited to all patents, patent applications, copyrights, mask works, trade secrets and other intellectual property rights and moral rights, along with any registrations of or applications to register any such rights.

*Id*. at Ex. 5 § 2 (emphasis added).

101.    Also under the Assignment Agreement, Blockbase Group represented and warranted that it was the sole owner and could grant "**exclusive** right, title and interest" to the Assigned Asserts.  The Assignment Agreement recites that Blockbase Group:

> **represents and warrants** to [Layer1] that [Blockbase] is the sole owner, inventor and/or author of, and that [Blockbase] **owns, and can grant exclusive right, title and interest in and to, each of the Assigned Assets** and that none of the Assigned Assets are subject to any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party, or any other rights that might interfere with [Layer1]'s use, or exercise of ownership of, any Assigned Asset.

*Id*. at Ex. 5 §3 (emphasis added).

102.    Layer1 thus owns the entire right, title and interest in the Assigned Assets, including exclusive rights.

### D.   The Assigned Assets

103.    The term "**Assigned Assets**" is defined to include "the **Technology**, all **Derivatives**, all **Intellectual Property Rights** and all **Embodiments**, collectively."  *Id*. at Ex. 5 § 1.5 (emphasis added).

104.    The term "Assigned Assets," as used in this Complaint, has the meaning set forth in the Assignment Agreement.

17

105.     The "**Technology**" is "described" in Exhibit A to the Assignment Agreement as follows:

> All **know how**, **software** in both source and object code forms, drawings, designs, **technology**, **ideas**, processes, formulas, compositions, data, **techniques**, **improvements**, **inventions** (whether patentable or not), works of authorship, mask works, **trade secrets**, domain names, URLs, websites, unique names, logos used or proposed to be used in the business, business and product development plans, market studies, financial projections, customer lists, **and all other information and items relating to the business of Layer1** Technologies Inc and any predecessor (**including**, without limitation, **the business of providing technology services**), as well as any **precursors, derivatives, modifications, and improvements** to the same, and any **related materials** (including but not limited to documentation, designs, algorithms, notes, etc. related thereto).

> *Id*. at Ex. A to Ex. 5.

106.     Layer1's business—when the Assignment Agreement was entered and since—includes cryptocurrency mining.

107.     Defendants understood this, and committed to helping Layer1 expand its business.

108.     Layer1 both mines cryptocurrency itself and provides co-location services.

109.     Layer1's co-location services allow third parties to rent space in Layer1's Pyote, Texas data center to run their mining equipment there, as managed by Layer1.

110.     As recited in the definition of "Technology," Blockbase Group also assigned the "Technology" relating to "the business of providing technology services." *Id.* at Ex. A to Ex. 5.

111.     The "business of providing technology serves" includes cryptocurrency mining management and co-location services.

112.     Blockbase Group accordingly assigned all of items defined as "Technology" to the extent they related to the business of Layer1—cryptocurrency mining—or to "the business of providing technology services."

113.    The other defined terms that are included in the definition of "Assigned Assets" are broadly defined as follows:

| Term | Definition |
|------|------------|
| **"Derivative"** | **(a) any derivative work** of the Technology (as defined in Section 101 of the U.S. Copyright Act) and analogous works under the laws of any other state, country or jurisdictions, however denominated; **(b) all improvements, modifications, alterations**, adaptations, enhancements and new versions of the Technology; and **(c) all technology**, inventions, products or other items that, directly or indirectly, incorporate, or are derived from, any of the foregoing. *Id*. at Ex. 5 § 1.2 (emphasis added). |
| **"Embodiment"** | **all documentation**, drafts, papers, **designs**, schematics, diagrams, models, prototypes, **source and object code** (in any form or format and for all hardware platforms), computer-stored data, diskettes, manuscripts and other items describing all or any part of the Technology, any Derivative, any Intellectual Property Rights or any information related thereto or **in which all of any part of the Technology, any Derivative, any Intellectual Property Right** or such information **is set forth, embodied, recorded or stored**. *Id*. at Ex. 5 § 1.4 (emphasis added). |
| **"Intellectual Property Rights"** | collectively, **all rights throughout the world** in all **patents and patent applications**, including but not limited to any patents and patent applications listed on Exhibit A hereto, patent rights, **copyright**s, copyright registrations, moral rights, **trade names**, **trademarks**, service marks, **domain names and registrations** and/or **applications** for all of the foregoing, **trade secrets**, **know-how**, mask work rights, rights in trade dress and packaging, goodwill **and all other intellectual property rights and proprietary rights relating in any way to the Technology, any Derivative or any Embodiment**, whether arising under the laws of the United States of America or the laws of any other state, country or jurisdiction. *Id*. at Ex. 5 § 1.3 (emphasis added). |

114.    The terms "Derivative," "Embodiment," and "Intellectual Property Rights," as used in this Complaint, shall have the meanings set forth in the Assignment Agreement.

**E.   The Assignment Agreement Required Blockbase Group to "Deliver All Embodiments" and Information Relating to the Intellectual Property**

115.   Pursuant to the Assignment Agreement, Blockbase Group also agreed to deliver all Embodiments to Layer1, warranted that it was the sole owner and could grant exclusive right, title and interest to the Assignment Assets, and agreed to provide all items and information necessary for Layer1 to fully ascertain and secure the assigned rights.

116.   More specifically, the Assignment Agreement recites that Blockbase Group "agrees to **deliver all Embodiments** of all Assigned Assets to [Layer1] at a location designated by [Layer1] no later than the date of this Agreement."  *Id*. at Ex. 5 § 2 (emphasis added).

117.   The Assignment Agreement also required Blockbase Group to provide, *inter alia*, all information and papers for Layer1 to ascertain and fully secure its rights in the Assigned Asserts, including intellectual property:

> The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement. **Assignor further agrees**, promptly upon request of the Company, or any of its successors or assigns, **to execute and deliver**, without further compensation of any kind, any power of attorney, assignment, application for any Intellectual Property Right or other intellectual property right protection, **or any other papers which may be necessary or desirable to fully secure to the Company**, its successors and assigns, **all right, title and interest in and to each of the Assigned Assets**….

> *Id*. at Ex. 5 § 4 (emphasis added).

**IV.   Defendants Failed to Deliver All Embodiments and Information to Layer1**

118.   In April 2020, Blockbase Group, through Stanic and Dietrich, delivered to Layer1 source code for some of Blockbase Group's software for mining management  for use in managing Layer1's Pyote mining operations.

119.   However, Defendants never delivered all Embodiments to Layer1.

120.     Defendants retained embodiments, including electronic copies of source code on their own computer systems and media, instead of delivering the entirety to Layer1.

121.     Further, Defendants failed to deliver any documentation relating to the source code, such as documentation explaining how the code was organized or otherwise functioned, who wrote the code, where the code was written, or when the code was written.

122.     Nor did Defendants provide any other information, such as know-how (other than the methods reflected in the source code) for optimizing, maintaining, controlling, or otherwise managing mining operations.

## V.   Defendants' Partnership With and Use of the Assigned Technology to Service Layer1's Competitor — Hive

123.     In or around 2019, Defendants owned a cryptocurrency mining facility in Sweden that was located adjacent to HIVE's Swedish cryptocurrency mining facility.

124.     On information and belief, at the same time that Blockbase Group and Stanic were negotiating and that Blockbase Group entered into the Agreements with Layer1, Blockbase, including through Stanic and Dietrich, was negotiating with Blockbase's neighbor—HIVE—to provide cryptocurrency mining operation management services to HIVE using Assigned Assets.

125.     HIVE's cryptocurrency mining operations include Bitcoin mining, which directly competes with Layer1's West Texas Bitcoin mining operations.

126.     By August 13, 2019, Blockbase Group, at least through Stanic, entered into a contract with HIVE whereby Blockbase Group would use the Assigned Assets to manage HIVE's mining operations.

127.     Per Blockbase Group's Agreements with Layer1, the Assigned Assets included, as a non-limiting example, Blockbase's cryptocurrency mining management software and related mining management know-how and trade secrets.

128.    On August 13, 2019, HIVE issued a press release "announc[ing] that it has entered a strategic partnership with Blockbase Group DWC-LLC [] as the new software operator and maintenance services provider for the Company's flagship facility in Sweden.  Blockbase's highly optimized software monitoring services are expected to enhance the efficiency of HIVE's GPU mining operations while reducing costs." *See* HIVE Blockchain Enters Strategic Partnership with Blockbase Group and Provides Biweekly Status Update, Press Release, August 13, 2019 4:00PM CDT, *available at* https://www.bloomberg.com/press-releases/2019-08-13/hive-blockchain-enters-strategic-partnership-with-blockbase-group-and-provides-biweekly-status-update   (last accessed January 24, 2022).

129.    In a November 7, 2019 press release, HIVE "announce[d]" that it "ha[d] seen improvements in the efficiency and performance of our Swedish facility by leveraging Blockbase's newer software. … With the transition in Sweden complete, we are now focusing on a similar optimization program for our other geographic operations…. [W]e continue to assess expansion opportunities in North America."  *See* https://www.hiveblockchain.com/news/hive-blockchain-announces-completion-of-transition-to-blockbase-in-sweden/ (last accessed February 28, 2022).

130.    Under the Assignment Agreement between Blockbase Group and Layer1, Layer1 also owned any "newer" Blockbase software because the conveyed and assigned "Technology" expressly included any "derivatives, modifications, and improvements."  Ex. 1 at Ex. A to Ex. 5. Additionally, the Assignment Agreement defined "derivative" to include, without limitation, "all improvements, modifications, alterations, adaptations, enhancements and new versions of the Technology…."  *Id*., § 1.2.

131.    In a June 20, 2021 United States Securities and Exchange Commission ("SEC") filing, HIVE stated that under its strategic partnership agreement with Blockbase, "Blockbase

will provide all things necessary for the configuration, management, operation, security, maintenance and support for [HIVE]'s Sweden facility." Further, "[o]n June 1, 2020, [HIVE] extended its partnership with Blockbase to be the facility operator for the [HIVE]'s Iceland operation." *See* HIVE Blockchain Technologies Ltd., Management's Discussion and Analysis of Financial Condition and Results of Operations, Amended and Restated, June 30, 2021, https://www.sec.gov/Archives/edgar/data/1720424/000106299321009936/exhibit99-5.htm (last accessed January 30, 2022).

132.    By and through its agreement and business with HIVE, Blockbase has used the "Assigned Assets" that belong to Layer1 to provide mining management services and other mining-related technology services to HIVE.  HIVE publicly announced its strategic partnership with Blockbase within approximately six weeks after the effective dates of Blockbase Group's Agreements with Layer1.

133.    Blockbase could not have developed completely different technology and used it to manage HIVE's competing operations within approximately six weeks without using any of the "Assigned Assets," such as know-how, source code, algorithms, formulas, and trade secrets. Developing mining management software, including writing the underlying source code, takes at a minimum many months to even preliminarily code, and months longer to debug and test before it can be used for mining operations.  Dietrich has been Blockbase's CTO at all relevant times so he has used the Blockbase know-how that Layer1 now owns to develop the Blockbase mining management software before Blockbase Group conveyed and assigned it to Layer1, and continues to use that know-how when using and otherwise modifying the software for HIVE's mining operations.  Additionally, the source code that Blockbase provided to Layer1 shows that a Blockbase Consulting employee, Mario Schallner wrote significant portions of the source code.

According to Schnallner's LinkedIn profile, at this time this Complaint was filed, he was working for Blockbase Consulting as a "Solution Architect / Senior Lead Software Engineer." https://www.linkedin.com/in/mario-schallner-71a03b126/?originalSubdomain=at (last visited February 28, 2022). Further, the source code that Blockbase provided to Layer1 is written in multiple programming languages. This demonstrates that Blockbase had been developing the code for years, and could not newly develop the source code that it uses to manage HIVE's operations in a matter of weeks, especially without using the Assigned Assets.

134. Further, as previously explained, under the Assignment Agreement, Blockbase Group conveyed and assigned, *e.g.*, all "derivatives, modifications, and improvements" to the "technology," "software," "know how," "processes," "ideas," "trade secrets," and "formulas." Ex. 1 at Ex. A to Ex. 5. Therefore, to the extent that Blockbase modified, improved, or otherwise altered the assigned source code for use in managing HIVE's facilities, such code, as well as associated know-how, is also owned by Layer1.

135. Stanic represents on his LinkedIn page that Blockbase Group was founded in 2015, again demonstrating that Blockbase took years to develop its code and could not newly develop the code that it uses to manage HIVE's operations in weeks. https://www.linkedin.com/in/vladostanic/(last visited February 28, 2022).

136. Stanic represented to Layer1 that he and Blockbase Group had spent years developing Blockbase Group's cryptocurrency mining management software, including the underlying source code, and had previously used it to manage other companies' mining operations.

137. Blockbase has collected substantial sums of money from using the Assigned Assets to manage HIVE's mining operations. On information and belief, this specifically includes Blockbase Group, because HIVE's August 13, 2019 press release announced that HIVE had

24

"entered a strategic partnership with Blockbase Group DWC-LLC …."  This also specifically includes Blockbase Consulting, because a November 30, 2021 HIVE "Underwriting Agreement" discloses that HIVE's "strategic agreement" is with Blockbase Consulting. https://docs.publicnow.com/viewDoc?hash_primary=BD0B24BE422A05A0352F03452A1E628 910FCA684 (last visited February 28, 2022).

138.   For example, in its June 30, 2021 SEC filing, HIVE reported that during the three-month period ending June 30, 2021, HIVE had paid "[o]perating and maintenance costs" of "$6.2 million consisting of fees paid to suppliers including local electricity providers, as well as service provider Blockbase, and includes electricity, daily monitoring and maintenance and all other costs directly related to the maintenance and operation of the data centre equipment."

139.   Further, it is standard cryptocurrency mining industry practice for software providers to charge licensing fees to mining companies using the software.  On information and belief, Blockbase is collecting licensing fees—royalties—for the use of the software and associated intellectual property that Layer1 owns and has exclusive rights to.

140.   On information and belief, Defendants conspired with one another to commit the wrongful acts identified herein.  Each Defendant was aware that each of the others planned to commit the wrongful acts identified herein, agreed with, assisted, and cooperated with each other, and intended that the wrongful acts be committed.  On information and belief, Stanic and Dietrich used the Defendant entities and other entities in attempts to minimize liabilities and otherwise shift assets.  At one point, for example, Stanic attempted to shift the founder's shares of Layer1 stock from Blockbase Group to BBG Holdings, claiming that Blockbase Group and BBG Holdings had a closely related "affiliate" relationship such that transfer restrictions associated with the founder's shares did not apply.

141.    On information and belief, Defendants Stanic and Dietrich each personally participated in, authorized and directed Blockbase Group, Blockbase Consulting's, and BBG Holdings' actions in making false representations to Layer1, breaching the Agreements with Layer1, and misappropriating Layer1's trade secrets, as further set forth below.

142.    On July 8, 2021, Layer1 wrote Blockbase's U.S. attorneys at Ashby & Geddes, P.A., that Blockbase had breached the Assignment Agreement by using Assigned Assets for Blockbase's customers, including HIVE, and for Blockbase's own commercial benefit.  Layer1 demanded that Blockbase provide all monies received, including payments for intellectual property usage, to Layer1.  Layer1 also explained that it would take legal action if Blockbase did not rectify the situation.  Blockbase failed to respond.

## COUNT 1: BREACH OF CONTRACT
### *Against Blockbase Group*

143.    Layer 1 incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

144.    As set forth above, Layer1 and Blockbase Group entered into the written Founder's Agreement and written Assignment Agreement, effective no later than July 1, 2019.

145.    Pursuant to the express terms of the Founder's Agreement, Blockbase Group received 1,000,000 shares of Layer1 stock in partial or full exchange for Blockbase Group's "assignment to [Layer1] of certain technology and related rights owned by [Blockbase Group] by delivery to [Layer1] of an Assignment of Technology Agreement…."

146.    By the express terms of the Assignment Agreement, "[Blockbase Group] forever sells, assigns, transfers, releases and conveys to [Layer1], and its successors and assigns, [Blockbase Group]'s entire right, title, and interest in and to each and all of the Assigned

26

Assets…." The Assigned Assets include Blockbase's cryptocurrency mining technology, such as, for example, Blockbase's mining software and related know-how and intellectual property.

147.    Layer1 performed its obligations under the Agreements by providing 1,000,000 shares of its stock to Blockbase Group.

148.    However, Blockbase Group materially breached the Agreements in numerous respects.

149.    First, less than two months after Blockbase Group entered into the Agreements with Layer1,  Blockbase Group entered into the strategic partnership agreement with HIVE.  Under the strategic partnership agreement, Blockbase Group agreed to use the Assigned Assets to manage HIVE's cryptocurrency mining operations.  This is a material breach of the Agreements because, under the Agreements, the Assigned Assets belong to Layer1, and Blockbase may not use them to support any other ventures, let alone *competing* ventures.

150.    Blockbase Group has collected and continues to collect substantial sums of money, including licensing fees, through breaching the Parties' Agreements; that is, by using the Assigned Assets to manage and otherwise service HIVE's mining operations, without Layer1's permission, without compensating Layer1, in breach of the Agreements and in derogation of Layer1's ownership rights.

151.    Second, Blockbase Group also materially breached the Agreements by failing to deliver all Embodiments to Layer1, including Embodiments developed or otherwise created after signing the Agreements.

152.    Rather, Blockbase Group maintained possession of Embodiments.

153.    For example, instead of delivering all Embodiments to Layer1, Blockbase Group maintained control over the Assigned Assets.  As non-limiting examples:

a.  Blockbase Group retained copies of source code and object code, and then used that code, and modified versions of it, to manage HIVE's competing cryptocurrency mining operations and to develop newer versions of source code and software.

b.  Blockbase Group retained copies of source code that it improved and otherwise updated based on Layer1's input and using Layer1's own know-how.

c.  Nor did Blockbase Group deliver any documentation or know-how meaningfully describing the Embodiments, the Technology, Derivatives, or Intellectual Property rights.  On information and belief, Blockbase Group has such documentation, *e.g.*, documents describing how its mining software source code is organized, how the software functions, the underlying algorithms, and other information and approaches to optimizing, maintaining, and otherwise managing mining hardware and methods.

154.  Instead of delivering all Embodiments, Blockbase Group used and continues to use them to manage at HIVE's competing cryptocurrency mining operations.

155.  Blockbase Group's failure to deliver documentation about the Assigned Assets, including even basic documentation explaining how the source code's functionality and organization, left Layer1 struggling to modify the mining management software for use in managing Layer1's Pyote operations, and otherwise dependent on Defendants to assist Layer1 on an *ad hoc* basis.

156.  On information and belief, Blockbase Group kept the documentation describing the source code's organization and functionality to itself, along with other know-how, so Blockbase Group could successfully and competitively manage HIVE's and other third parties' mining operations that compete with Layer1's Pyote operations.

157.    Blockbase Group's retention of such documentation and know-how prevented Layer1 from effectively using, modifying, and otherwise improving the source code and software for Layer1's own purposes.

158.    As set forth above, given that Blockbase Group began managing HIVE's mining operations within approximately two months of entering the Assignment Agreement with Layer1, Blockbase Group did not have sufficient time to independently develop other software for managing HIVE's operations.

159.    Third, Blockbase Group also advertises its mining management and co-location services on its website in an effort to attract other customers.  Such services would necessarily involve Blockbase Group improperly using and collecting compensation for the Assigned Assets and Embodiments.  Thus, Blockbase is seeking to expand its business, and earn additional revenues, in breach of the Parties' Agreements.

160.    Fourth, Blockbase has also breached the Agreements by failing to deliver any information to Layer1 about the Intellectual Property Rights that it assigned to Layer1.

    a.  On information and belief, the Assigned Assets may be covered by intellectual property that was assigned to Layer1, or eligible for coverage under intellectual property laws, such as copyright, trade secret, trademark and patent laws.

    b.  For example, in many countries, including the United States, copyrights exist automatically in an original work of authorship once it is fixed in a tangible medium.  This includes copyrights relating to computer software.  However, in many countries, including the United States, copyrights cannot be asserted in litigation until they are registered with the appropriate governmental authority.

    c.   Blockbase has not, for example, provided sufficient information so that Layer1 can, if it chooses not to keep the software as a trade secret, register copyrights to the Blockbase mining software that Layer1 now owns.  For example, Blockbase did not deliver information about when, where, and by whom the code was written.  Blockbase has thus, at a minimum, interfered with and otherwise damaged Layer1's ownership interests in the intellectual property rights.

    d.   As another example, Blockbase has not provided any information to Layer1 about the assigned trade secrets relating to managing mining operations and co-location.

161.    Fifth, the Assigned Assets include Blockbase Group's domain names, URLs, and web sites.  Blockbase Group has also breached the Parties' Agreements by continuing to use the URL blockbasemining.com and associated URLs, the blockbasemining.com website, and the Blockbase domain, including to further Blockbase's own misuse of the Assigned Assets.

162.    Besides breaching the foregoing express requirements of the Agreements, Blockbase's misconduct, as described above, also breached, *inter alia*, the implied covenant of good faith and fair dealing in both Agreements.

163.    Due to Blockbase's failures to perform and other misconduct, as set forth above, consideration for the Agreements failed.

164.    As a result of Blockbase Group's breaches of the Agreements, Layer1 has sustained financial harm due to Blockbase Group's retention and misuse of the Assigned Assets, including collection of revenues therefrom, and competitive harm from Blockbase Group using the Assigned Assets to manage and otherwise further HIVE's competing cryptocurrency mining operations and possibly other competitors' mining operations.  Layer1 will face additional financial harm in the

future as a result of Blockbase Group's breaches, including the use and distribution of the Assigned Assets to Layer1's competitors.

165.    Layer1 accordingly hereby provides notice of rescission of the Agreements and offers any required restoration.

166.    Rescission is warranted because Defendants obtained Layer1's consent to the Agreements through fraud.

167.    At the time the Agreements were negotiated, entered into and executed, Blockbase Group and Stanic represented that Blockbase Group would perform its obligations under the Agreements, including, for example, transferring conveying and assigning all of the Assigned Assets to Layer1, and delivering all Embodiments to Layer1.

168.    However, Blockbase Group and Stanic did not intend to perform, provide full consideration, or otherwise honor their promises as reflected in the Agreements.

169.    Rather, on information and belief, Defendants intended to use the Assigned Assets to generate revenue for themselves by using them to manage HIVE's competing cryptocurrency mining operations throughout the world.

170.    In the alternative, Layer 1 seeks all other available remedies, including damages and injunctive remedies.

## COUNT 2: FRAUDULENT INDUCEMENT
*Against Defendants Stanic and Blockbase Group*

171.    Layer 1 incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

172.    In or around June 2019, Stanic, purportedly on behalf of Blockbase, met with Layer1's representatives, including Dolic, in-person in Texas.  This included meetings at the electrical substation that Layer1 would later purchase in Pyote, and in Houston.

173.    Stanic, including on Blockbase Group's behalf, falsely represented to Layer1 that Blockbase Group would fully convey, deliver, and assign its cryptocurrency mining technology, including without limitation Blockbase's mining software and related know-how and intellectual property, to Layer1 in exchange for 1,000,000 shares of Layer1 stock.

174.    In reliance on those representations, Layer1 agreed to convey 1,000,000 shares of its stock Blockbase Group.

175.    Stanic's and Blockbase Group's false representations are memorialized in the Founder's Agreement and Assignment Agreement, as is Layer1's agreement to convey the 1,000,000 shares to Blockbase Group.

176.    Stanic also signed both the Agreements on behalf of Blockbase Group, falsely representing that that he and Blockbase Group intended to honor the agreements therein.

177.    Stanic and Blockbase Group intended that Layer1 act upon their false representations by conveying 1,000,000 shares of Layer1 stock to Blockbase Group.

178.    In reliance on Stanic's and Blockbase Group's representations, Layer1 conveyed 1,000,000 shares of its stock to Blockbase Group.

179.    Stanic and Blockbase Group knew at the time that they met with Layer1 in Texas, negotiated the Agreements, and when Blockbase Group entered into the Agreements, that they did not intend to fully deliver, convey, and assign Blockbase's cryptocurrency mining technology and related rights to Layer1.  They also knew that they did not intend to honor the terms of the Agreements.

180.    On information and belief, at the same time that Stanic and Blockbase Group met with Layer1 in Texas, and Stanic executed the Agreements for Blockbase Group, Defendants were

pursuing a strategic partnership with HIVE whereby they would use Blockbase's cryptocurrency mining technology and intellectual property to manage HIVE's mining operations.

181.    Less than two months after Stanic executed the Agreements with Layer1, HIVE announced that it and Blockbase Group had formed a strategic partnership for Blockbase Group to manage HIVE's cryptocurrency mining operations using Blockbase software.

182.    Layer1's reliance on Stanic's and Blockbase Group's false representations have injured Layer1 in the form of economic loss, including the loss of 1,000,000 shares of Layer1 stock and associated rights, and will continue to harm Layer1.

## COUNT 3: VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT
### *Against All Defendants*

183.    Layer 1 incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

184.    By way of the Agreements, Blockbase conveyed and assigned to Layer1 exclusive ownership of confidential, proprietary and trade secret information from Blockbase on or around July 1, 2019 (the "Assigned Trade Secrets").

185.    The Assigned Trade Secrets comprised at least the assigned software, in source and object code forms, technical information on the software, and know-how as to the software from Blockbase.  The software included the following functionality relating to cryptocurrency mining: monitoring crypto mining hardware operations, measuring and remotely adjusting performance, configuration, controlling potential overheating and alerting, adjusting overclocking (to run the system at higher clock speed than for which it was originally designed, overseeing on-site maintenance, remote shutdown and activation of the mining hardware, and other checks and controls).

186.     The Assigned Trade Secrets constitute "trade secrets" under the Defend Trade Secrets Act because they constitute scientific and technical information, including codes, formulas and methods to optimize the mining of cryptocurrency.

187.     By and through the Agreements and the related discussions, Layer1 and Blockbase Group took efforts to maintain the secrecy of the Assigned Trade Secrets, in order to maintain the value of the Assigned Trade Secrets.

188.     As set forth above, Blockbase Group failed to deliver all of the Assigned Trade Secrets to Layer1.

189.     On information and belief, Blockbase, before and after executing the Agreements with Layer1, has taken reasonable measures to keep the Assigned Trade Secrets confidential. Thus, what Blockbase assigned, conveyed, and otherwise transferred constituted secret information.

190.     On information and belief, Blockbase has used and continues to use the Assigned Trade Secrets to remotely manage mining operations, or to otherwise manage mining equipment located at secured facilities under Blockbase's physical control, including locations in the United States.  For example, Blockbase represents that it "builds and manages data centers in … the USA for high-performance computing (HPC) application such as cryptocurrency mining." https://blockbasemining.com/careers/ (Exhibit 2, last visited February 28, 2022).  And Stanic represents that he "grew the operation organically from a small mining container next to a hydro-power plant in Austria to multiple Mega Watt facilities in Austria, Sweden, Iceland, Texas." https://www.linkedin.com/in/vladostanic/ (last visited February 28, 2022).

191.     On information and belief, Blockbase maintains physical and technological control over its data centers, including through video surveillance systems and limited physical access.

*See, e.g.*, https://blockbasemining.com/hosting-agreement/ at Hosting Agreement § 3.1 (last visited February 28, 2022).

192. Further, and on information and belief, Blockbase requires that its customers execute a hosting agreement requiring the customers to "undertake to maintain the confidentiality of credentials for access to e-mail and other electronic means, and not transfer them to third Parties." *See* https://blockbasemining.com/hosting-agreement/ at Hosting Agreement § 3.4 (last visited February 28, 2022).

193. To the extent that Layer1 used some of Assigned Trade Secrets to monitor Layer1's mining operations, Layer1 took reasonable measures to keep the Assigned Trade Secrets confidential from individuals and entities outside of Layer1. For example, Layer1 secured its computer system while Layer1 was using the source code that Blockbase provided to manage Layer1's mining operations. Layer1 prohibited access to non-employees other than two select IT engineers with confidentiality obligations who are employed by a Layer1 shareholder that is also a Layer1 technical partner. Further, Layer1 only granted access to select Layer1 employees. It also required employees and business partners to sign a confidentiality agreement and implemented protocols to prevent any unauthorized transfer of the Assigned Trade Secrets. Layer1 stored and continues to store the source code that it received from Blockbase in a secure, cloud-based repository called GitHub. Layer1 pays a substantial monthly fee to maintain this highly secure service, which complies with software industry security standards, and does not enable or allow anyone outside of select Layer1 employees with a "need to know," and the IT engineers, to access the source code.

194. The Assigned Trade Secrets derive actual and potential independent economic value from not being generally known to other competitors in the industry. Blockbase's years of

learning, trial and error, and efforts to develop the source code and management methods was what Layer1 intended to gain through the Agreements.  Layer1 intended to, and took steps to, secure the technology from Blockbase and prevent competitors from acquiring the very same code and technology from Blockbase.

195.    Upon information and belief, Defendants approached HIVE to form a relationship and, notwithstanding their promises to and Agreements with Layer1, agreed to continue using the Assigned Trade Secrets to manage HIVE's mining operations.

196.    Indeed, on information and belief, in violation of the Blockbase Group's Agreements with Layer1 and without Layer1's consent, Defendants used and continue to use the Assigned Trade Secrets for commercial purposes and without Layer1's authorization, to manage HIVE's competing mining operations.

197.    Defendants understood that Layer1 intended to use the Assigned Trade Secrets at Layer1's facilities in Pyote, Texas.

198.    On information and belief, for months while Defendants were contracting with, and otherwise communicating and working with Layer1 to provide select secret information for use at Layer1's Pyote facilities, Defendants were committing various acts in furtherance of their trade secret misappropriation.  This included  retaining the Trade Secret Information they were required to, *inter alia*, convey, deliver and assign to Layer1 in Texas for Layer1's use in Texas; attempting to sell Defendants' services, which used the Trade Secret Information, to HIVE and others customers, including the U.S.; and otherwise continuing to use the Trade Secret Information for Defendants' other operations, including, as Defendants represent, in the United States.  Further, such misappropriation continues to this day.

199.     The Assigned Trade Secrets have actual and potential value to third parties, including HIVE, because HIVE is Layer1's competitor.  The information is not generally known to the public and is not readily ascertainable by proper means.  Defendants and HIVE obtain economic value from using such confidential, proprietary and trade secret information.

200.     Defendants knew, or had reason to know, that they had an obligation to cease use of the Assigned Trade Secrets for anything other than a limited time for the furtherance of Layer1's mining operations, per the Agreements with Layer1, and to take steps to otherwise maintain the secrecy of the Assigned Trade Secrets.

201.     Blockbase Group's, Blockbase Consulting's, BBG Holdings' actions, as carried out by Stanic and Dietrich, amount to willful and intentional misappropriation of the Assigned Trade Secrets.

202.     The Court is authorized to enjoin the actual or threatened misappropriation of a trade secret related to a service used in, or intended for use in, interstate or foreign commerce.

203.     The Assigned Trade Secrets are intended for use interstate and foreign commerce. For example, the Assigned Trade Secrets are employed to manage cryptocurrency mining operations that necessarily involve both interstate and foreign commerce.  For example, the Bitcoin blockchain ledger is decentralized and stored in the Internet throughout the United States and the world.  Further, on information and belief, Blockbase, from at least Austria, uses the Assigned Trade Secrets to manage cryptocurrency mining throughout the world, including at HIVE's facilities globally.

204.     Layer1 may seek monetary damages to recover its actual loss and the unjust enrichment caused by the Defendants' collective actual and threatened misappropriation.

## COUNT 4: VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT
*Against All Defendants*

205.   Layer 1 incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

206.   Defendants misappropriated Layer1's trade secrets under the Texas Uniform Trade Secrets Act (TUTSA).  *See* Tex. Rev. Civ. Stat. §§ 134A.001-134A.007.

207.   As explained *supra*, Layer1 became the rightful owner of the Assigned Trade Secrets on or around July 1, 2019, the effective date of the Agreements.

208.   The Assigned Trade Secrets comprised at least the assigned software, in source and object code forms, technical information on the software, and know-how as to the software from Blockbase.  The software included the following functionality relating to cryptocurrency mining: monitoring crypto mining hardware operations, measuring and remotely adjusting performance, configuration, controlling potential overheating and alerting, adjusting overclocking (to run the system at higher clock speed than for which it was originally designed), overseeing on-site maintenance, remote shutdown and activation of the mining hardware, and other checks and controls.

209.   This Assigned Trade Secrets constitute "trade secrets" under the TUTSA because it is scientific and technical information, including codes, formulas and methods regarding the mining of cryptocurrency.

210.   As set forth above, Defendants failed to deliver all of the Assigned Trade Secrets information to Layer1.

211.   On information and belief, Blockbase, before and after executing the Agreements with Layer1, has taken reasonable measures to keep the Assigned Trade Secrets confidential.

Thus, what Blockbase assigned, conveyed, and otherwise, transferred constituted secret information.

212.    Rather than disclosing the Assigned Trade Secrets to persons outside of Blockbase, Blockbase uses the Assigned Trade Secrets to remotely manage mining operations, or to otherwise manage mining equipment located at secured facilities under Blockbase's physical control.

213.    On information and belief, Blockbase maintains physical and technological control over its data centers, including through video surveillance systems and limited physical access. *See, e.g.*, https://blockbasemining.com/hosting-agreement/ at Hosting Agreement § 3.1 (last visited February 28, 2022).

214.    Further, and on information and belief, Blockbase requires that its customers execute a hosting agreement requiring the customers to "undertake to maintain the confidentiality of credentials for access to e-mail and other electronic means, and not transfer them to third Parties." *See* https://blockbasemining.com/hosting-agreement/ at Hosting Agreement § 3.4 (last visited February 28, 2022).

215.    To the extent that Layer1 used some of Assigned Trade Secrets to monitor Layer1's mining operations, Layer1 took reasonable measures to keep the Assigned Trade Secrets confidential from individuals and entities outside of Layer1.  For example, Layer1 secured its computer system while Layer1 was using the source code that Blockbase provided to manage Layer1's mining operations.  Layer1 prohibited access to non-employees other than two select IT engineers with confidentiality obligations and employed by a Layer1 shareholder that is also a Layer1 technical partner.  Further, Layer1 only granted access to select Layer1 employees.  It also required employees and business partners to sign a confidentiality agreement, and implemented protocols to prevent any unauthorized transfer of the Assigned Trade Secrets.  Layer1 stored and

continues to store the source code that it received from Blockbase in a secure, cloud-based repository called GitHub.  Layer1 pays a substantial monthly fee to maintain this highly secure service, which complies with software industry security standards, and does not enable or allow anyone outside of select Layer1 employees with a "need to know," and the two IT engineers, to access the source code.

216.   The Assigned Trade Secrets derive actual and potential independent economic value from not being generally known to other competitors in the industry.  Blockbase's years of learning, trial and error, and efforts to develop the source code and management methods was what Layer1 intended to gain through the Agreements.  Layer1 intended to, and took steps to, secure the technology from Blockbase and prevent competitors from acquiring the very same code and technology from Blockbase.

217.   Upon information and belief, Stanic, Dietrich, and Blockbase Group approached HIVE to form a relationship and, notwithstanding their promises to and Agreements with Layer1, agreed to continue using the Assigned Trade Secrets to manage HIVE's mining operations.

218.   Indeed, on information and belief, in violation of the Agreement with Layer1 and without Layer1's consent, Blockbase disclosed to HIVE the Assigned Trade Secret Information, and use such information for commercial purposes and without authorization.

219.   The Assigned Trade Secrets have actual and potential value to third parties, including HIVE, because HIVE is Layer1's competitor.  The information is not generally known to the public and is not readily ascertainable by proper means.  Defendants and HIVE obtain economic value from using such confidential, proprietary and trade secret information.

220.   Defendants knew, or had reason to know, that they had an obligation to cease use of the Assigned Trade Secrets for anything other than a limited time for furtherance of Layer1's

mining operations, per the Agreements with Layer1, and to take steps to otherwise maintain the secrecy of the Assigned Trade Secrets.

221.    Blockbase Group's, Blockbase Consulting's, and BBG Holdings' actions, as carried out by Defendants Stanic and Dietrich, amount to willful, malicious and intentional misappropriation of the Assigned Trade Secrets.

222.    As a direct and proximate result of the Defendants' conduct, Layer1 has lost business and may continue to lose business as a result of Defendants' unfair competition.

223.    For the harm and loss suffered by Layer1, and for the harm and loss that will contribute but for the intervention of this Court, Layer1 has no adequate remedy at law.  If Defendants, and third parties through Defendants, are permitted to continue using Layer1's trade secrets, Defendants and those third parties will have profited by Defendants' own wrongs and Layer1's trade secrets may be further disseminated, resulting in damages to Layer1 that are substantial but not susceptible of precise calculation.

224.    Layer1 may seek monetary damages and injunctive relief to recover its actual loss and for the unjust enrichment caused by the Defendants' misappropriation.

## COUNT 5: UNJUST ENRICHMENT
*Against All Defendants*

225.    Layer 1 incorporates by reference into this Count all allegations stated elsewhere in this Complaint.

226.    Blockbase Group, Blockbase Consulting, Stanic, Dietrich, and BBG Holdings— through Blockbase Group—have received property in the form of 1,000,000 shares of Layer1 stock.  Defendants were enriched by their receipt of the Layer1 stock.

227.    Layer1 was impoverished by Defendants' receipt of the Layer1 stock.

228.    Layer1 was not compensated with the promised Assigned Assets.

229.    The Assigned Assets include technology and other know-how, whether potentially covered by intellectual property rights or not.  Such technology is not limited to confidential information and trade secrets, or to potentially copyrighted works.

230.    For example, the "Technology" under the Agreements includes "domain names," "URLs," "web sites," "logos used," and other publicly assets readily ascertainable by proper means and that do not derive economic value from being confidential.  As another non-limited example, the "Technology" can include all "know how" relating to cryptocurrency mining and the business of providing technology services, regardless of whether that "know how" is confidential.

231.    Defendants obtained the Layer1 shares by taking undue advantage of Layer1.

232.    Under the circumstances, in equity and justice, the Layer1 shares belong to Layer1, and it would be unconscionable for Defendants to retain them.

233.    Layer1 has no adequate remedy at law to compensate for the losses they have incurred and continue to incur as a result of Defendants' unlawful conduct.

## JURY DEMAND

234.    Layer1 hereby demands a jury trial of all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

For the reasons stated herein, Layer1 prays for judgment against Blockbase Group, Blockbase Consulting, BBG Holdings, Vlado Stanic and Alexander Dietrich, including the following relief:

(1) A judgment that Defendants have misappropriated trade secrets, including without limitation their unjust enrichment from such misappropriation;

(2) A disgorgement of profits of all Defendants;

(3) Punitive damages, costs, and attorneys' fees due to the willful and malicious misappropriation of Layer1's trade secrets and Defendants' fraudulent inducement;

(4) Disgorgement and/or destruction of all products, specifications, documents, plans, or other items created by Defendants using Layer1's trade secrets;

(5) An injunction prohibiting further use by Defendants of the trade secrets of Layer1;

(6) Piercing the corporate veil of Blockbase Group, Blockbase Consulting, and BBG Holdings, and holding Stanic and Dietrich individually liable for any judgment owned to Layer1 because, under a sham to perpetrate fraud based on the actions of Stanic and Dietrich, it would be unjust to hold only Blockbase Group, Blockbase Consulting, and BBG Holdings, liable for any such judgment;

(7) Rescission of the Agreements, including return of Blockbase Group's shares in Layer1, and/or damages for Blockbase Group's breach of contract, including costs, prejudgment interest, and post-judgment interest;

(8) An injunction, requiring Blockbase Group, Blockbase Consulting, BBG Holdings, and all agents, employees, and affiliates thereto, to specifically perform under the Agreements by providing Layer1 with full and complete access and ownership to the Assigned Assets; and

(9) Such other and further relief as the Court deems just and equitable.

Dated: February 28, 2022                **MAYER BROWN LLP**

By:  /s/ Jacqueline M. Vallette

Jacqueline M. Vallette
State of Texas Bar No. 24099000
James B. Danford, Jr.
State of Texas Bar No. 24105775
700 Louisiana Street, Suite 3400

Houston, Texas 77002
Telephone: (713) 238-3000
Fax: (713) 238-4888
E-mail: jvallette@mayerbrown.com
E-mail: jdanford@mayerbrown.com

Alex C. Lakatos (*pro hac vice* forthcoming)
District of Columbia Bar No. 453763
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000
Fax: (202) 263-3300
Email: alakatos@mayerbrown.com

Graham (Gray) M. Buccigross (*pro hac vice*
forthcoming)
State of California Bar No. 234558
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 331-2000
Fax: (650) 331-2060
E-mail: gbuccigross@mayerbrown.com

Priya A. Desai (*pro hac vice* forthcoming)
State of Illinois Bar. No. 6323809
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Fax: (312) 701-7711
E-mail: pdesai@mayerbrown.com

**COTTON, BLEDSOE, TIGHE, AND
DAWSON, PC**

William E. Berry, Jr.
State of Texas Bar No. 24006841
P.O. Box 2776
Midland, Texas 79702
Telephone: (432) 684-5782
Fax: (432) 682-3672
Email: bberry@cbtd.com

*Attorneys for Layer1 Technologies Inc.*